## Case No. 8,340.

LIEBART et al. v. The EMPEROR.

[Bee, 339;[1]  3 Hopk. Rep. 163.]

Admiralty Court, Pennsylvania.    Oct. 3, 1785.

SHIPPING—BOTTOMRY BOND — HYPOTHECATION TO CONSIGNEE.

1. A bottomry bond can be entered into by the master only under circumstances of great distress, and when he has no other means of repairing.

[Cited in The Hunter, Case No. 6,904; Leland v. The Medora, Id., 8,237.]

2. Hypothecation cannot be made to a consignee.

[Cited in Greely v. Smith, Case No. 5,750.]

In admiralty.

HOPKINSON, J. Judgment: This is a suit brought on a bottomry bond given by John Walsh to the libellants at Ostend, whereby he hypothecates the ship Emperor, of which he was then the captain, for 4500 florins, equal to £409. 1s. 9d. sterling money of Great Britain, advanced for repairs of the said ship. Whereupon James Oellers, the owner of this ship, and others his assignees, come in and answer to the libel, alleging that this bottomry bond ought not to take effect as an hypothecation, according to the maritime law. The power vested in a master of a vessel to impawn his owner's ship or goods for necessaries furnished in a foreign port, is a legal indulgence founded on the urgency of the case, and for the general benefit of commerce. There are few rules of law more strictly defined than this of hypothecation, and none in which the reason and intention of the law are more manifest. It is thus delineated: "A master of a ship hath no power to take up money by bottomry, in places where his owner or owners dwell." "But when a master is out of the country, and where he hath no owners, nor any goods of their's, nor of his own, and cannot find means to take up by exchange or otherwise, and that for want of money the voyage might be retarded or overthrown, moneys may be taken up upon bottomry." Moll. de J. Mar. bk. 2, c. 11, § 11. "And the money so taken up by the master, is done upon great extremity, and that for the completing of the voyage, when they are in distress and want in some foreign parts." Id. § 12. All the books agree in the spirit of this doctrine. The extreme necessity appears, every where, to be the reason of the law, and the intention, to favour commerce.

Let us now take a view of the circumstances of the present case. The leading facts

[1] [Reported by Hon. Thomas Bee, District Judge.]

appear, from the testimony exhibited, to be these: The ship Emperor, John Walsh master, belonging to James Oellers of Philadelphia, sailed for Ostend with a cargo of tobacco on board; the ship and cargo being consigned by the owner to Bine, Overman and Co. merchants at Ostend. This ship was so damaged by a storm at sea, that the captain was obliged to put into the port of Dover, in England, in distress. The captain on his arrival at Dover, immediately sent notice of his situation to the consignees at Ostend, and they speedily furnished him with a credit on London, from which he raised money sufficient to refit his ship. After this, he sailed for and arrived at Ostend, where the consignees took charge of the ship and cargo. Before the vessel arrived at Ostend, Bine, Overman and Co. had accepted bills, to a considerable amount, drawn upon them by Oellers, on the credit of this consignment. Upon closing all accounts, Bine, Overman and Co. found that Oellers had not only drawn upon them to the full amount of the cargo and freight ("the tobacco not selling so well as was expected"), but that there remained a considerable balance in their favour. To secure this balance, they tell Captain Walsh that he shall not leave the port, and even threaten to attach the ship, unless he will repay them the moneys advanced at Dover for repairs, or hypothecate the ship, for security. It was not in Captain Walsh's power to do the one, that is, to repay the money, and he declined the other proposal for some time. But finding expenses accumulating, and that he could not sail without some accommodation, he at last consented to hypothecate the ship. Bine, Overman and Co. then recommended him to Liebart, Baes, Durdeyn and Co. telling him that they would lend money on bottomry; and conducted him to their house, where he executed the bottomry bond, now in question. But no money was paid to Walsh; for the bills for repairs, for which the ship was hypothecated, had long since been discharged by the produce of the credit on London. After this, Bine, Overman and Co. permitted Captain Walsh to sail, and in due time he arrived in the port of Philadelphia. During these transactions, Oellers had failed, and assigned this ship to his creditors, and the question now is, whether this bottomry bond shall operate to the exclusive security of the merchants at Ostend against all other creditors, as a genuine hypothecation would do, on the principles of maritime law.

After a careful consideration of these circumstances, I cannot discover one real feature of that rule of law, which should be the ground of the present suit. True it is that the ship was in necessity, and so is every ship that wants essential repairs. But the owner had credit within reach. The consignees were not far distant. The application was easy and certain, and the consignees no sooner heard of the disaster but they

furnished the means of relief. In fact, Bine, Overman and Co. had the strongest inducements to exert themselves in getting the ship repaired at Dover, to enable her to get round to Ostend, for they had made themselves answerable for Oellers' bills, upon the credit of this cargo; it was, therefore, of great importance to them that the cargo should arrive safe to their hands. So that, instead of advancing money to a distressed stranger, they were only taking care of their own security. This motive is manifested by their letter to Walsh at Dover, and still further by their subsequent conduct; for, after they had disposed of the cargo, and found a balance due from Oellers to them, they insist that Walsh shall not sail unless he will hypothecate the ship to Liebart, Baes, Durdeyn and Co. which, from all appearances, seems to be the same thing as hypothecating her to themselves. For the captain received no money from Liebart, Baes, Durdeyn and Co. who were not at all interested in the transaction, and whose names were only made use of to save appearances; for Bine, Overman and Co. well knew that, being consignees, the captain had no power to hypothecate the vessel to them. And, in order to give the bottomry bond the appearance of a genuine hypothecation, they select from the general account the moneys spent in repairs at Dover, and compel the captain to hypothecate the ship, as for those particular charges, to the libellants, who had not advanced one shilling towards that expense. Further, if we look into the accounts we shall find, that although this voyage was not a very successful one, yet the ship cleared all charges accrued since she sailed from Philadelphia, even including the repairs at Dover. But Oellers had drawn upon Bine, Overman and Co. on the credit of the future voyage, long before the vessel sailed from Philadelphia, to raise money to fit her out, and it is these drafts brought into account which make a balance due to the consignees. So that, instead of an hypothecation made to enable a ship to complete her voyage, it was, in fact, made to enable her owner to begin one. Which was never the object of the maritime law in cases of hypothecation. Neither was this law ever designed to give partial advantages in mercantile connexions, or intended to secure the balance of a running account between owners and consignees.

The importance of the present decision to the commercial character of our country has been strongly urged, in favour of the libellants. But I am not apprehensive on this account. The question in view is not to be determined by any municipal law of the country, but by a general law, universally received and understood. And I am of opinion, that our national character would much more suffer by an adjudged precedent, which might open a door for dangerous collusions, by putting it in the power of captains of vessels to saddle their owners with un-

necessary engagements, or to give an unfair advantage to foreign creditors, by a fraudulent use of that preeminent lien which the law lays on a ship and goods properly hypothecated. I do not mean to suggest that there has been any fraud or collusion in the present case. It is enough that I do not find the claim of the libellants within the spirit or intention of the maritime law. And, therefore, I adjudge that the bill be dismissed, and that the libellants pay the costs of suit.

From this decision there was an appeal to the high court of errors and appeals. The cause was again argued there, but the judgment of the court of admiralty was confirmed. The following notes, taken at the time, contain the substance of the judgment given in the high court of errors and appeals in the above cause:

"October 3, 1785. The court observed, that the power of a master to hypothecate his owner's ship was a necessary, but sometimes a dangerous power: the court was unwilling to extend this power farther than the law strictly authorized. A genuine hypothecation ought to be the voluntary act of the master at the time when, and in the place where, the moneys were advanced for necessaries or repairs. The money advanced ought to be solely on the faith of the hypothecation, and not on any personal credit. These are incontrovertible principles—the present case not applicable to them. Although the hypothecation was made to Liebart, Baes, Durdeyn and Co. yet it was to secure moneys advanced by Bine, Overman and Co. the consignees. No authority shewn, and none can be shewn, because none ought to be, that an hypothecation can be made to a consignee: great mischiefs might arise if captains could hypothecate to consignees. No authority produced to prove that an hypothecation can be made in any port but that in which the vessel first arrives after the distress and damage sustained. Bine, Overman and Co. did not repair the vessel on the faith of the hypothecation; but this hypothecation was made to secure to consignees the balance of a running account. The court unanimous in confirming the sentence of the admiralty."